BETTY RYDER, PETITIONER-RESPONDENT, v. RIVERSIDE GARDENS, INC., RESPONDENT-APPELLANT, AND BUR-TON MOORE, RESPONDENT-RESPONDENT.

Superior Court of New Jersey
Appellate Division

Argued April 6, 1959—Decided July 8, 1959.

554

Before Judges GOLDMANN, CONFORD and FREUND.

*Mr. Paul B. Thompson* argued the cause for appellant (*Messrs. Emory, Langan, Lamb & Blake,* attorneys).

*Mr. Edmund J. Canzona* argued the cause for respondent (*Messrs. Parsons, Labrecque, Canzona & Combs,* attorneys).

The opinion of the court was delivered by

GOLDMANN, S. J. A. D. Riverside Gardens, Inc. (Riverside) appeals from a County Court judgment affirming a Workmen's Compensation Division award to petitioner and her two sons for the death of her husband, Frederick Ryder, resulting from a fall from the third floor of the Riverside Garden Apartments, a building owned by Riverside. Petitioner's claim against Burton Moore, the tenant occupying the apartment from which her husband fell, was dismissed. She does not appeal this action.

Ryder was a carpenter, and for some eight to ten years had done considerable repair work in the apartment building owned by Riverside. The corporation had a full-time superintendent, William Johnson, and two other full-time employees to take care of normal maintenance work. However, when something beyond ordinary maintenance was involved, Johnson would inform either Burton Doremus, secretary of the corporation, or Doremus' sister, Helen Conover, the vice-president. If Doremus or Mrs. Conover decided that

the work should be done, he or she would tell Johnson to summon Ryder. Johnson had authority in an emergency to take whatever steps were necessary to remedy the situation, including the hiring of outside help. Although there is conflicting testimony as to whether Johnson also had authority to hire Ryder in the absence of an emergency, without consulting Doremus or Mrs. Conover, it is at least clear that it was Johnson who would speak to Ryder, explain the job to him, and ultimately give him the money he earned.

Ryder also did work for various tenants in the building at their own expense. Normally this would come about by a tenant informing Johnson of some job he wanted done, and asking him to send someone to attend to it. Johnson would usually send Ryder, who was his close friend.

On October 13, 1956 Ryder was in the apartment of Mr. and Mrs. Burton Moore on the third floor of the Riverside Garden Apartments. Whether he was then working for the Moores or for Riverside, the owner of the building, will be discussed in detail below. The building was but three stories high, and the Moore living room windows on the east side projected out from the sloping roof. The lowest portion of the roof was below the window and formed a ledge of 10 or 12 inches. Ryder's work on the day in question apparently called for his going outside the window and, again apparently (since no one saw the accident), it was from this ledge that he fell to his death. The ledge was examined sometime after the accident and was found unbroken.

Petitioner's theory is that her husband was in the employ of Riverside at the time he fell. She contends that he had been retained by Johnson, with the approval of Mrs. Conover, to repair the windows on the east side of the Moore apartment. It is clear from the record that these windows had been leaking for about ten years and that the Moores had complained of this to Johnson, Doremus and Mrs. Conover.

Riverside, on the other hand, maintains that Ryder was in the apartment at the request of Mr. Moore, for the pur-

pose of putting covers on the air conditioning units there. It also urges that even if Johnson sent Ryder to repair the windows, neither Doremus nor Mrs. Conover had approved this work, so what Johnson did was beyond the scope of his authority. The corporation further argues that Ryder's death was caused by his intoxication and, in any event, he was an independent contractor and not an employee.

The deputy director held that petitioner had sustained her burden of proving that her husband was employed by Riverside at the time of his death. He also held against the corporation on the other issues just mentioned. The County Court affirmed, and hence this appeal.

We do not consider it necessary to discuss at any length the issue of Ryder's alleged intoxication. Riverside clearly failed to discharge its burden of proving that this was the proximate cause of death.

As to the contention that Johnson had no authority to employ Ryder, suffice it to say that Johnson had at least the apparent authority to do so. The corporation is as fully responsible for his acts within the scope of such authority as if he had actual authority. *El v. Newark Star-Ledger,* 131 *N. J. L.* 373 (*Sup. Ct.* 1944).

We do not reach the relatively more difficult question of whether Ryder (assuming he was retained by Johnson to repair the windows) was an employee or an independent contractor, for our independent review of the record (*Russo v. United States Trucking Corp.,* 26 *N. J.* 430 (1958); *Ricciardi v. Marcalus Manufacturing Co.,* 26 *N. J.* 445 (1958)) convinces us that petitioner has not carried the burden of proving that her husband was working for Riverside at the time he fell to his death.

Petitioner's main witness was William Johnson, who had been superintendent of the Riverside Garden Apartments from 1947 until March 1957, six months before the hearing. He testified that sometime prior to October 13, 1956 Mrs. Conover had authorized him to hire Ryder to repair the windows in the Moore apartment. He, in turn, spoke to

Ryder about this job during the week preceding the accident, while Ryder was doing some other work at the building.

According to Johnson, Ryder arrived at the apartment building about 10 A. M., October 13, 1956. Ryder told him he would go up to the apartment to examine and measure the windows, and then would tell him whether they could be repaired or would have to be replaced. Although Johnson's testimony is vague on the point, it seems that Ryder then told him he would leave and return later that day, or the following day, to do the measuring. In any event, Johnson went shopping, and when he returned at about 1:30 P. M., he learned that Ryder had been killed.

On cross-examination Johnson said that despite the frequent complaints of the Moores about the rain coming in through their two living room windows, the windows had not yet been repaired when he left Riverside's employ in March 1957. Ryder, according to the witness, had over the years repaired about 50 such defective windows in the building.

Johnson was then confronted with his signed statement, taken by Capello, an insurance investigator, on October 15, 1956, two days after the accident. The statement began by describing the procedure by which Johnson, with the approval of Doremus, had frequently employed Ryder to work for the corporation. It then said that Ryder had sometimes been employed by various tenants for their own purposes, and continued as follows:

"* * * Sometime about one week ago I met a tenant Burton Moore Apt. 3A in the front yard. Mr. Moore asked me to tell Mr. Ryder that he, Mr. Moore had a job of installing plastic covers on Mr. Moore's air conditioning units, which are located outside of the windows on the third floors. On or about Tuesday or Wednesday of last week Fred Ryder came to the apartment to borrow some lumber. At this time I told Mr. Ryder of Mr. Moore's request. Mr. Ryder stated that he would make the arrangements with Mr. Moore. I do not know when Mr. Ryder made these arrangements. On Saturday Oct. 13, 1956 at or about 10 or 11 A. M. Mr. Ryder met me in the front yard of the house and told me to tell Mr. Moore that he would not complete the job on Mr. Moore's air con-

ditioners on that date, since he had another job to do in Lincroft which would take him most of the day. I did not see Mr. Moore to tell him. I did not see or hear of Mr. Ryder until about 1:30 P. M. when Mr. and Mrs. Moore came to my apartment and notified me that Mr. Ryder was laying below their window on the ground about forty feet below their window. Mr. Moore told me that Fred Ryder was standing outside his window and Mr. Moore had left the room to get the plastic covers. Mr. Moore said that when he returned to the window, Mr. Ryder was no longer on the ledge. Mr. Moore then saw that Mr. Ryder was laying on the ground. At the time of this accident Mr. Ryder was acting entirely on his own, was not authorized to do this work by me and I was not keeping any record of Mr. Ryders time on this job which Mr. Ryder was doing directly for Mr. Moore. The last time I recall that Mr. Ryder worked under my authorization was on or about Oct. 8 to 10. I forwarded Mr. Ryders check to him for this job on Oct. 11, 1956 at which time Mr. Ryder stopped by my apartment. I have read the four page statement. It is true Wm. G. Johnson."

When Johnson was shown this statement the following colloquy took place:

"Q. * * * Can you tell us whether that is your signature? A. Well, of course, that is not my signature.

Q. This is William Johnson? A. That is me.

Q. Is that your signature? A. Sure.

Q. Now, do you remember giving this statement to a representative of the insurance company concerning this accident on October 15, 1956 which was just two days after the accident? A. I am going—

Q. Just answer the question, Mr. Johnson, do you remember or don't you remember?

The Deputy Director: It is a simple question.

The Witness: I can't remember.

Q. You remember a man coming around from the insurance company and asking you for a statement on this accident? A. Remember a man?

Q. Yes. A. I will say ten men.

Q. You remember a man coming around? A. Every night and every day.

Q. Do you remember one man coming around on October 15, 1956? A. I will say I remember but I am not sure.

Q. You remember signing this? A. Certainly I signed it. * * *"

Johnson conceded that certain portions of the statement were true, but denied the truth of that part which indicated

Ryder was working for Moore at the time he fell. At the conclusion of this line of questioning, when Riverside's attorney read the date of the statement as October 15, 1956, Johnson said:

"Mr. Ryder lost his life on the 13th. I guess you never had a friend, did you? I have, and he and I were buddies. Fellows all came in to me and I tried to tell them to the best of my knowledge if I had seen anything that day, but I didn't put my hand on the Bible either."

. Burton Moore, also testifying for petitioner, said that on October 13, 1956, at about 12 noon, Ryder came to his apartment and said that Johnson had sent him to look over and measure the windows. To Moore's knowledge, Ryder carried no tools of any kind. Ryder stayed in the apartment for a few minutes and then left, saying he would return at one o'clock. When Ryder returned Moore was in another room and did not see him. He next saw Ryder lying on the ground after the fall.

On cross-examination Moore said that one of the two windows on the east side of the living room had an air conditioning unit in it. The units in his apartment were newly acquired in the summer of 1956, and on the day Ryder came Moore had an air conditioner cover in the apartment. However, Ryder had not taken such a cover out on the roof with him, nor did Moore see a cover lying on the ground near the body. Moore repeated that he did not see Ryder when the latter returned to the apartment at about 1 p. m., nor did he know of his own knowledge that Ryder climbed out the window. When he entered the living room there was a window open, but he did not see Ryder. He had been talking to his wife when he heard a strange noise, "like slipping." He went to the window and saw Ryder lying on the ground.

Moore admitted he had been questioned by the police approximately half an hour after the accident. He was then asked if he remembered telling Officer Glover of the

Red Bank Police Department that Ryder had been fixing an air conditioner unit for him when he fell. Moore replied he did not. The following then ensued:

"Q. Do you deny that you told Officer Glover that? A. Well, if I have no memory of it I would naturally deny it.

Q. You do deny it, sir. A. It may go into the record accordingly."

Mrs. Moore was also a witness for petitioner. She testified that Ryder came to the apartment at about noon on October 13, 1956 and said that "he had been sent up by Mr. Johnson to do a job." Ryder returned to the apartment at about ten minutes past one the same day. After admitting him to the living room, she went into the kitchen and did not see him again until after he fell.

On cross-examination Mrs. Moore said that on Ryder's first visit to the apartment he merely talked with her husband for about seven to ten minutes, but did nothing with any tools. On his return she did not see him carrying any tools. Both windows on the east side of the living room had been closed when Ryder first arrived, but after he fell she saw that one window was open.

Burton Doremus, secretary of the corporation, testified on behalf of respondent Riverside. He stated that no arrangements had been made for Ryder to repair the windows in the Moore apartment. He also said that when he arrived at the scene of the accident he saw an air conditioner cover lying on the ground "in the general area." The third significant point to which Doremus testified concerned a conversation with the Moores. As he stood with them in the crowd near Ryder's body, one of them—he could not recall which one—told him that Ryder had been putting a cover on one of their air conditioners when he fell. They had asked Johnson to get someone to do the job for them and Ryder had appeared in response. This statement, according to Doremus, was repeated a short time later in the Moore apartment during the police interrogation as to the cause of the death.

On cross-examination Doremus described the air conditioner cover as being soft—it could be folded—and made of "composition." He could not describe its color, but did recall that it looked new and that it was picked up and taken upstairs. Doremus was not asked, nor did he specify, who picked up the cover and took it upstairs. Doremus had himself used such an air conditioner cover, and he indicated that it was put on a unit by slipping it over and tying it on. It is a job which takes only a few minutes, he said, but it is "rather awkward sometimes to get there to tie under."

Riverside's next witness was Raymond J. Walker, an independent investigator, who had interviewed Johnson in connection with the accident. The court sustained objections by counsel for petitioner because of the improper form of several questions designed to elicit answers indicating that Johnson had said Ryder was working for the Moores at the time he fell. As a result, Walker testified only that Johnson had told him Moore had asked to have covers made for an air cooling system.

Helen Conover, vice-president of Riverside, said that she had never authorized Johnson's hiring Ryder to repair the windows in the Moore apartment. On one occasion, however, Johnson had told her that Ryder was willing to paint the windows. She had then indicated that ultimately Ryder might have to be hired for that purpose, since Moore did not want the regular painter in his apartment.

Detective Glover of the Red Bank Police Department, who had investigated the accident, was the next witness for Riverside. He testified that immediately after Ryder's body had been removed, he, Mr. and Mrs. Moore, and Doremus had gone to the Moore apartment. There Moore told him that Ryder had been "working on the air conditioning unit" when he fell. Glover had not noticed anything lying on the ground in the vicinity of the body. He explained that his job was to determine whether the death was the result of a homicide or an accident. His first

concern was to call the doctor, which he did, and thereafter "to find out what happened and where and so forth."

Appellant then called Capello, the insurance investigator who took down Johnson's signed statement. He is employed by the company that carries Riverside's compensation insurance. Capello testified that the statement was handwritten by him, and that in part he used his own words to record Johnson's answers to questions, and in part quoted Johnson directly. After completing the statement he asked Johnson to read it and sign it. Johnson did so. Capello was explicit in saying that Johnson had read the statement before signing.

Respondent Moore testified on his own behalf that he had never employed Ryder, had never entered into a contractual relationship with him, and in fact had no relationship with the deceased at all.

Mrs. Moore also testified for her husband and said that she had never hired Ryder. On the day in question there were air conditioner covers on a chair in her living room, but she did not know where the covers were after the accident. She did not notice whether one was lying on the ground near Ryder's body, nor did she notice whether one was missing after the accident.

Despite petitioner's attempt to support her case by reference to certain circumstantial evidence and the testimony of Mrs. Moore, it is clear that her case rests almost exclusively on the testimony of Johnson and Mr. Moore. Before further discussing the testimony of these two witnesses, however, we shall dispose of the allegedly supporting evidence just referred to.

In her testimony as to why Ryder came to the apartment, Mrs. Moore said only that the deceased told her Johnson had sent him to do a job. Under both the hypotheses urged in this case—that Ryder was working on the air conditioner or that he was working on the windows—it was Johnson who sent Ryder to the Moore apartment. The issue was whether Johnson did this at Moore's request with the intent

that Ryder work for Moore, or whether Johnson did this on behalf of Riverside, owner of the building. Mrs. Moore's testimony was as consistent with one theory as the other and is therefore of no help to petitioner. Similarly, her statement that she had not hired Ryder was of little if any significance, since this did not preclude the more likely hypothesis that her husband, as head of the household, had hired the deceased.

Petitioner also argues that Ryder's having climbed out of a window which did not contain an air conditioning unit indicates that he was not working on the air conditioners but rather on the windows. We find this argument unpersuasive. The record does not describe the air conditioners, but it is reasonable to believe that a person could not easily climb through a window which contained such a unit. If Ryder were attempting to tie the cover to the back of the unit, from the outside, it would be normal for him to go out through the unobstructed window. We note that no one has contended that the cover could easily be tied on from inside the apartment. It would not be unreasonable to assume that Ryder climbed out on the ledge in order to attach the cover.

Another inference urged upon us by petitioner, which we also find unconvincing, is that Ryder's leaving the apartment for lunch and then returning to do his work indicates that he intended to do something which would take him much longer than merely attaching covers to air conditioners—namely, examining and measuring the windows. One fallacy in this argument is the unwarranted assumption that Ryder's examination and measurement of the windows would take more time than would the job of attaching the covers. The Moores had at least two air conditioning units, and if the task of covering them involved going out on the roof, it might well have taken considerable time. Further, and more significantly, it is not so improbable that Ryder might want to go to lunch before undertaking

even a small job. Petitioner's reasoning here is much too tenuous to lend any support to her argument.

We return, then, to what has been said above—that petitioner's case rests on the testimony of Johnson and Moore, and if that testimony is not credible, she has not established her case.

On the issue of the credibility of witnesses, the findings of the deputy director are entitled to considerable weight, *Russo v. United States Trucking Corp.*, 26 *N. J.* 430, 435 (1958). They are not, of course, controlling. In a civil action tried by a judge without a jury we will not hesitate to reverse when we are convinced that the issue of credibility was erroneously decided. *A fortiori* in a compensation proceeding, where we are required to make an independent review of the record, we will not sustain a finding as to credibility which we are convinced is mistaken. A careful examination of the testimony of Johnson and Moore convinces us that these witnesses were not credible.

First as to Johnson. The statement purportedly given by him to the insurance adjuster two days after Ryder's death is, of course, not admissible as proof of the questions in issue, but only as a means of affecting Johnson's credibility as a witness.

We see no reason to doubt that Capello recorded Johnson's statement as it was given to him. It is not reasonable to believe that he would write something completely different from what Johnson said, and then present this false document to him for his signature. Moreover, Johnson did not deny that the statement was an accurate record of what he said. He maintained only that he had not read it before signing.

As to whether Johnson was telling the truth in the statement or when he was on the witness stand, the former is the only reasonable conclusion deducible from the facts. He offered no rational explanation as to why he would give an untrue statement to Capello. His only explanation is that he was besieged by investigators and that he did not have

his hand on the Bible. It does not require extensive thought to conclude that this hardly explains the fabrication of a story which would deprive his friend's widow of compensation benefits. That the statement was given but two days after the accident, whereas the compensation hearing took place approximately one year later, also weighs against our accepting Johnson's witness stand version as true.

On the other hand, Johnson's motives for testifying falsely at the hearing before the deputy director are more understandable. He had been a close friend of Ryder. He would naturally feel sympathy for the widow and want to help her and the children. Moreover, he had left his job with Riverside only a short time prior to the hearing, after having been employed at the Riverside Garden Apartments for some ten years. While these two elements by themselves would not necessarily cast doubt on Johnson's testimony, yet, when combined with the earlier contradictory statement he had given Capello and which he could not satisfactorily explain, they irrefutably indicate that Johnson was not telling the truth at the trial.

As to Mr. Moore. In view of the testimony of Detective Glover regarding the statement given him by Moore within a very short time after the accident, we are convinced that Moore's testimony as to why Ryder was in his apartment also cannot be believed. Glover certainly had no reason to falsify his account of this conversation, and Moore did not unequivocally deny that he made the statement attributed to him. Rather, he testified that he did not remember doing so. When asked specifically if he denied it, he gave the evasive responses quoted above. Further, Doremus, although an interested witness, corroborated the fact that Moore made such a statement.

We can see a motive for Moore's testifying falsely at the trial, but can conceive of no reason for his giving an untrue statement to the police shortly after the accident. Recall that Moore was a party to the action. For him to have testified that Ryder had been working for him would—or

so it may have seemed to the witness—more likely have resulted in his being held liable than would a finding that the deceased was employed by Riverside at the time of his death. Although Moore could not, in fact, have been held liable even under the former hypothesis since Ryder would at best have been no more than a casual employee, yet this point might not have been as clear to Moore as it is to us in retrospect. Indeed, when Moore's attorney moved at the conclusion of petitioner's case to dismiss the petition as against his client, no mention was made of the "casual employment" issue.

Inherent in the statement given to the police by Moore is its truth. A man does not normally invent a wholly fictional account of an accident—a story which can in no way benefit him and may well inure to his detriment. In the absence of some explanation as to why Moore should lie to Glover in this way, it is no more than reasonable to believe that he first told the truth, and only later altered his account of the accident when he took the witness stand.

We note, incidentally, that unlike the signed statement of Johnson, Moore's statement to Detective Glover constitutes an admission against interest by a party to the litigation. As such it is admissible not only to impeach the credibility of the party making the statement, but also as substantive evidence against that party. The deputy director admitted the statement as evidence against Moore, but held that it could have no probative effect as concerns petitioner's claim against Riverside except, of course, as it might affect Moore's credibility as a witness.

At oral argument we explored the question of whether Moore's statement, once admitted as evidence against him as a party, might possibly also be used as evidence against petitioner. We therefore requested and received supplemental briefs on the point. We have, however, now decided that the question need not be resolved. For the purposes of this decision, we proceed on the premise that Moore's statement

can affect petitioner's claim against Riverside only to the extent that it impairs Moore's credibility.

In choosing to believe Moore's testimony the deputy director explained away the statement to the police by saying that Moore might have been excited at the time, and for this reason his statement should be given little weight. With this reasoning we cannot concur. If Moore was, in truth, excited at the time he spoke to Glover, it is more reasonable to believe that he would tell the truth at that time, rather than invent an untrue story and only a full year later, after time to reflect on the possibility of his being liable, tell what actually happened. The normally greater reliability of statements made in the wake of an unusual event, when the speaker is still excited, has long been recognized by the law. It finds expression in the exception to the hearsay rule which admits as probative evidence statements made under such circumstances. We are not to be considered as viewing Moore's statement in this aspect since it was not established that he was in fact excited.

From our finding that neither Johnson nor Moore was a credible witness, it follows that petitioner has not established that her husband was employed by Riverside at the time he fell to his death. The judgment must be reversed.

Riverside also complains that the County Court abused its discretion in assessing against it the full amount of petitioner's counsel fees on the appeal to that court. The preferable procedure, where the appeal is not frivolous, is to apportion the fee between petitioner and respondent. However, we hold there was no abuse of discretion here.